UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ALABAMA
NORTHERN DIVISION

TIARRA STEVENSON,

PLAINTIFF,

v.

EQUIFAX INFORMATION SERVICES, LLC AND TRANS UNION, LLC,

DEFENDANTS.

Civil Case No. 20-330

***JURY TRIAL DEMANDED***

**COMPLAINT**

Plaintiff Tiarra Stevenson ("Plaintiff"), by and through the undersigned counsel, and with knowledge as to Plaintiff's own acts, upon information, belief, and investigation of counsel as to the acts of others, believing such allegations have evidentiary support after a reasonable opportunity for further investigation or discovery alleges against Defendants Equifax Information Services, LLC and Trans Union, LLC as follows:

**PRELIMINARY STATEMENT**

1. This is an action for an actual, statutory and punitive damages, costs and attorneys' fees pursuant to 15 U.S.C. §§ 1681, *et seq*. ("Fair Credit Reporting Act" or "FCRA").

2. Indeed,

> Credit is the lifeblood of the modern American economy, and for the American consumer access to credit has become inextricably tied to consumer credit scores as reported by credit reporting agencies. In 1970, the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.* ("FCRA") was enacted "to ensure fair and accurate credit reporting, promote efficiency in the banking system, and protect consumer privacy." *Safeco Ins. Co. v. Burr*, 551 U.S. 47, 52 (2007). Towards that end, the FCRA requires a company that reports consumer credit information, referred to as a consumer reporting agency ("CRA"), to "adopt reasonable procedures for

> meeting the needs of commerce" which are "fair and equitable to the consumer." 15 U.S.C. § 1681(b).

*Burke v. Experian Info. Sols., Inc.*, No. 1:10-CV-1064 AJT/TRJ, 2011 WL 1085874, at *1 (E.D. Va. Mar. 18, 2011).

3. Accordingly, and

> In recognition of the critical role that CRAs play in the credit markets and the serious consequences borne by consumers because of inaccurate information disseminated in consumer credit reports prepared by CRAs, Congress placed on a CRA what can only be described as very high legal duties of care, set forth, as they apply to this case, in 15 U.S.C. §§ 1681e(b), 1681i(a)(1)(A), and 1681i(a)(3)(A).

*Burke v. Experian Info. Sols., Inc.*, No. 1:10-CV-1064 AJT/TRJ, 2011 WL 1085874, at *4 (E.D. Va. Mar. 18, 2011).

4. Congress made the following findings when it enacted the FCRA:

> (1) The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.
>
> (2) An elaborate mechanism has been developed for investigating and evaluating the credit worthiness, credit standing, credit capacity, character, and general reputation of consumers.
>
> (3) Consumer reporting agencies have assumed a vital role in assembling and evaluating consumer credit and other information on consumers.
>
> (4) There is a need to insure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy.

15 U.S.C. § 1681(a)(1-4). Thus, one of the fundamental purposes of the FCRA is "to require that consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information in accordance with the requirements of this subchapter." 15 U.S.C. § 1681(b). Accordingly, "[t]he FCRA evinces Congress' intent that consumer reporting agencies,

having the opportunity to reap profits through the collection and dissemination of credit information, bear 'grave responsibilities.'" *Cushman v. Trans Union*, 115 F.3d 220, 225 (3d Cir. 1997).

5. "Mixed files" create a false description of a consumer's credit history.

6. A "mixed file" occurs when information that relates to Consumer B appears in Consumer A's credit file.

7. The disclosure of consumers' credit files to third parties is recorded by the defendant as a request for the consumer's credit history.

8. Inquiries are items of information contained in a consumer's "file," as that term is defined by 15 U.S.C. § 1681(a)(g).

9. Equifax records and retains inquiries in consumers' files.

10. Trans Union records and retains inquiries in consumers' files.

11. The Federal Trade Commission ("FTC") defines a mixed file as a file that "refers to a Consumer Report in which some or all of the information pertains to Persons other than the Person who is the subject of that Consumer Report." *F.T.C. v. TRW, Inc.* 784 F. Supp. 361, 362 (N.D. Tex. 1991).[1]

12. Mixed files are not a new phenomenon. All of the defendants have been on notice of the existence of mixed files for almost forty (40) years. *See Thompson v. San Antonio Retail Merchants Ass'n*, 682 F.2d 509, 511 (5th Cir. 1982).

13. In the 1990's the FTC and the Attorneys General of a number of states filed an enforcement action against the nationwide consumer reporting agencies, including: Equifax

[1] Experian Information Solutions, Inc. is formerly known as TRW, Inc.

Information Services, LLC ("Equifax"); Trans Union, LLC ("Trans Union"); and TRW because of their failure to comply with the FCRA's maximum possible accuracy standard for the preparation of consumer reports, including the incidence of mixed consumers' files.

14. In 1992, Equifax signed an Agreement of Assurances with the Attorneys General of 18 states. Equifax agreed it would maintain reasonable procedures to prevent mixed files by accepting and using a consumer's full identifying information (full first and last name, middle initial, full street address, zip code, year of birth, any generational designation, and Social Security number) for matching and identification purposes in order to prevent the incidence and reoccurrence of mixed files.

15. In 1994, Equifax signed a Consent Order with the FTC. Equifax agreed it would follow procedures to detect logical errors prior to reporting information on a consumer's file to prevent mixed files and to reinvestigate mixed files.

16. In 1992, Trans Union signed a Consent Order with the Attorneys General of 17 states. Trans Union agreed that it would maintain reasonable procedures to prevent the occurrence or reoccurrence of mixed files. Trans Union agreed to adopt procedures to reinvestigate mixed files prepare summaries of the problems related to mixed files and corrective action.

17. More recently, the defendants have been the subject of numerous state attorney general actions relating to mixed files. For example, the New York Attorney General filed charges and settled claims with the defendants related to violations of the FCRA and more specifically, the incidence of mixed files.[2] *See In the Matter of Eric T. Schneiderman, Attorney General of the State*

---

[2] http://www.ag.ny.gov/press-release/ag-schneiderman-announces-groundbreaking-consumer-protection-settlement-three-national Last visited June 25, 2020; *see also* https://ag.ny.gov/pdfs/CRA%20Agreement%20Fully%20Executed%203.8.15.pdf Last visited June 25, 2020.

*of New York v. Experian Information Solutions, Inc.; Equifax Information Services, LLC; and TransUnion LLC.*

18. In 2012, Ohio Attorney General Mike DeWine initiated a multistate investigation of the defendants' credit reporting practices, again, including the incidence of mixed files. Thirty other states participated in the enforcement action against the defendants, including Alabama. The FCRA enforcement action resulted in a six million-dollar ($6,000,000.00) settlement with Equifax, Experian and Trans Union.[3] In addition to the monetary component of the settlement agreement, the defendants promised to take steps to reduce the number of mixed files in their databases.

19. In 2014, the Mississippi Attorney General filed a lawsuit against Equifax and Trans Union, again, alleging violations of the FCRA. Defendants settled the "meritless lawsuit" for over seven million dollars ($7,000,000.00).[4]

20. Prior to this lawsuit, each defendant was aware of each of the FTC and state attorney general enforcement actions[5] concerning the incidence and prevention of mixed files listed above.

21. Mixed files result in the disclosure of a consumers' most personal identifying and financial information absent the consumer's knowledge or consent, or both.

22. Mixed files also result in the debt collection harassment of innocent consumers because debt collectors use CRA databases to "skip trace" debtors and locate the alleged debtor's address and telephone number.

---

[3] https://texasattorneygeneral.gov/oagnews/release.php?id=5092 Last visited June 25, 2020.

[4] http://www.ago.state.ms.us/ag-jim-hood-announces-that-experian-transunion-and-equifax-will-overhaul-credit-reporting-practices-and-end-deceptive-marketing-in-mississippi/ Last visited June 25, 2020.

[5] Including the Texas state attorney general enforcement action settled in May of 2015. *See* http://www.ohioattorneygeneral.gov/Files/Briefing-Room/News-Releases/Consumer-Protection/2015-05-20-CRAs-AVC.aspx Last visited June 25, 2020.

23. Notwithstanding, mixed files continue to occur despite consumers' unique personal identifiers, consent decrees and settlement agreements with the defendants.

24. Defendants have each the defendant in thousands of private lawsuits wherein an allegation was made that they violated the FCRA. Moreover, Defendants are sued hundreds of times per year wherein an allegation is made that said defendants mixed the plaintiff's file with that of another consumer.

25. Private FCRA lawsuits have resulted in multi-million-dollar verdicts for consumers with mixed files.

26. For example, in 2002, the jury in *Judy Thomas v. Trans Union LLC,* District of Oregon, Case No. 00-1150-JE, found Trans Union had willfully violated the FCRA by mixing Judy Thomas with another consumer and failing to unmix them despite Ms. Thomas' disputes. The jury awarded Ms. Thomas $5 million in punitive damages and $300,000 in actual damages.

27. In 2007, the jury in *Angela Williams v. Equifax Information Services, LLC,* Circuit Court for Orange County Florida, Case No. 48-2003-CA-9035-0, awarded Angela Williams $2.7 million in punitive damages and $219,000 in actual damages after the jury found Equifax willfully violated the FCRA when it mixed Angela Williams with another consumer and failed to unmix them despite Ms. Williams' disputes.

28. In 2013, the jury in *Julie Miller v. Equifax Information Services, LLC,* District of Oregon, Case No. 3:11-cv-01231-BR, awarded Julie Miller $18.4 million in punitive damages and $180,000 in actual damages for willfully violating the FCRA by mixing Julie Miller with another consumer and failing to unmix them despite Ms. Millers' disputes.

29. In 2017, a jury assessed a $60 million verdict against Trans Union after the jury concluded Trans Union mixed innocent persons files and wrongly labeled them as terrorists and

drug dealers when Trans Union matched consumers with the Office of Foreign Asset Control list based on first and last name alone. *See Ramirez v. TransUnion LLC*, Case No. 3:12-cv-00632 (N.D. Cal. Jun. 20, 2017).

30. Defendants, in the regular course of business, maintain lists of the lawsuits filed against them. Equifax has produced such a list of other similar incidents to the undersigned in other FCRA mixed file cases.

31. "Evidence that a defendant has repeatedly engaged in prohibited conduct while knowing or suspecting that it was unlawful would provide relevant support for an argument that strong medicine is required to cure the defendant's disrespect for the law." *Dalton v. CAI*, 257 F.3d 409, 418 (4th Cir. 2001) (noting that whether "other consumers have lodged complaints similar to Dalton's against CAI" is relevant to willfulness under the FCRA).

32. Equifax has been ordered in single plaintiff FCRA lawsuits to produce discovery responses on the number of times it has been sued.

33. Trans Union has been ordered in single plaintiff FCRA lawsuits to produce discovery responses on the number of times it has been sued.

34. No less than three federal Courts of Appeal have held a consumer reporting agency violated § 1681e(b) and may be found to have willfully violated the FCRA when it mixed a consumer's file with another consumer.

35. The FTC had specifically warned consumer reporting agencies to review their procedures when a mixed file case occurs.

36. Despite federal law, Congressional mandate, federal and state government enforcement actions, thousands of consumer lawsuits, mixed files remain a significant problem for consumers, including Plaintiff.

37. The sale of consumers' most private and sensitive personal and financial information is a multi-billion-dollar industry for the CRAs.

38. Equifax reported more than $3.4 billion in operating revenue in its annual report for year ending in 2018.[6]

39. Trans Union reported over $2.3 billion in revenue for year ending 2018.[7]

## JURISDICTION & VENUE

40. This Court has jurisdiction pursuant to 15 U.S.C. §§ 1681p and 28 U.S.C § 1331.

41. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b).

## PARTIES

42. Plaintiff Tiarra Stevenson ("Plaintiff") is an adult individual and residing in Valley Grande, Alabama. Plaintiff is a "consumer" as defined by 15 U.S.C. § 1681a(c).

43. Defendant Equifax does business in this judicial district and is a Georgia corporation with its principal place of business located in Atlanta, Georgia. Equifax is a consumer reporting agency ("CRA") as defined by 15 U.S.C. § 1681a(f). Equifax regularly engages in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing "consumer reports" as defined by 15 U.S.C. § 1681a(f) to third parties. Equifax disburses such consumer reports to third parties of contract for monetary compensation. Equifax outsources business processes, including consumer disputes to other countries, such as Costa Rica, India and the Philippines.

44. Equifax's dispute vendors includes Intelenet and DDC.

---

[6] https://investor.equifax.com/~/media/Files/E/Equifax-IR/Annual%20Reports/2018-annual-report.pdf Last visited June 25, 2020.

[7] https://investors.transunion.com/~/media/Files/T/Transunion-IR/annual-reports/2018/annual-report-2018.pdf Last visited June 25, 2020.

45. Defendant Trans Union does business in this judicial district and is a Delaware corporation with its principal place of business located in Illinois. Trans Union does business in this judicial district. Trans Union is a CRA as defined by 15 U.S.C. § 1681a(f).

46. Trans Union regularly engages in the business of assembling, evaluating and disbursing information concerning consumers for the purpose of furnishing "consumer reports" as defined by 15 U.S.C. § 1681a(f) to third parties. Trans Union disburses such consumer reports to third parties of contract for monetary compensation. Trans Union outsources business processes, including consumer disputes to other countries, such as India.

47. Like Equifax, one of Trans Union's dispute vendors is Intelenet.

**FACTUAL ALLEGATIONS**

48. Defendants sell millions of consumer reports (commonly referred to as "credit reports" or "reports") per day and also sell credit scores.

49. Defendants sold credit reports relating to Plaintiff to third parties when they knew or should have known that the requests were made for a different consumer's report.

50. Defendants sold credit reports relating to Plaintiff to third parties that inaccurate and derogatory information.

51. The inaccurate information includes, but is not limited to, accounts, personal identifying information and inquiries.

52. The inaccurate information is false because the information does not relate to Plaintiff.

53. In other words, the information is inaccurate because it relates to a consumer other than Plaintiff.

54. The inaccurate information harms Plaintiff's credit reputation because it does not accurately depict Plaintiff's credit history or creditworthiness, or both.

55. Equifax prepared and issued consumer reports concerning Plaintiff to third parties that included the inaccurate information. Upon information and belief, Equifax identified, or should've identified, Plaintiff's file as a "confirmed mixed file" as that term is defined by Equifax's settlement agreement with the New York Attorney General. Equifax sold Plaintiff's credit report to third parties for transactions that did not relate to Plaintiff. Plaintiff disputed inaccurate information to Equifax. Equifax did not delete or reinvestigate all of the disputed items of information. Alternatively, Equifax failed to consider all relevant information and perform a reasonable reinvestigation of the disputed items of information. Plaintiff requested Equifax to provide Plaintiff with Plaintiff's file. On at least one occasion, Equifax failed to provide Plaintiff with Plaintiff's file.

56. Trans Union prepared and issued consumer reports concerning Plaintiff to third parties that included the inaccurate information. Upon information and belief, Trans Union identified, or should've identified, Plaintiff's file as a "confirmed mixed file" as that term is defined by Trans Union's settlement agreement with the New York Attorney General. Trans Union sold Plaintiff's credit report to third parties for transactions that did not relate to Plaintiff. Plaintiff disputed inaccurate information to Trans Union. Trans Union did not delete or reinvestigate all of the disputed items of information. On at least one occasion, Trans Union failed to provide Plaintiff with the dispute results.

57. In response to Plaintiff's disputes, Defendants did not contact third parties concerning the accuracy of the disputed information.

58. Defendants also did not review underlying account documents for each account contained in Plaintiff's file or the subject of Plaintiff's disputes, or both, such as the applications for credit and the personal identifying information reported with each trade line.

59. Defendants did not conduct any handwriting analysis on Plaintiff's signature or the signature on the account applications.

60. Defendants did not make a reasonable inquiry into the disputed information.

61. Defendants did not review all relevant information provided by Plaintiff related to the disputed information.

62. At best, the defendants verified the false information by confirming some of Plaintiff's personal identifying information with some of the personal identifying information reported by the data furnishers who supplied the disputed information.

63. Defendants failed to modify or delete all of the inaccurate information.

64. Despite Plaintiff's exhaustive efforts to date, Defendants have nonetheless deliberately, willfully, intentionally, recklessly and negligently repeatedly failed to perform reasonable reinvestigations of the above disputes as required by the FCRA.

65. As of result of the defendants' conduct, Plaintiff suffered unique and distinct actual damages in the form of adverse credit action, denial of credit, lost credit opportunities, harm to her credit reputation and credit score, out-of-pocket expenses, interference with Plaintiff's normal and usual activities and emotional distress, including anxiety, frustration, embarrassment and humiliation.

66. At all times pertinent hereto, the defendants were acting by and through their agents, servants and/or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of the defendants herein.

67. At all times pertinent hereto, the conduct of the defendants, as well as that of their agents, servants and/or employees, was intentional, willful, reckless, and in grossly negligent disregard for federal laws and the rights of the Plaintiff herein.

68. The defendants' conduct was a direct and proximate cause, as well as a substantial factor, in bringing about the serious and distinct injuries to the Plaintiff that are outlined more fully above and, as a result, the defendants are liable to the Plaintiff for the full amount of statutory, actual and punitive damages, along with the attorney's fees and the costs of litigation, as well as such further relief as may be permitted by law for their violations of federal law.

**COUNT ONE – VIOLATIONS OF THE FAIR CREDIT REPORTING ACT**
**(Against Equifax)**

69. Plaintiff adopts and incorporates the above-numbered paragraphs as if fully stated herein.

70. Equifax negligently failed to comply with the requirements of the FCRA, including Sections 1681b, e(b), g, c-1 and i.

71. Alternatively, Equifax willfully failed to comply with the requirements of the FCRA, including Sections 1681b, e(b), g and i.

72. As a result of Equifax's failure to comply with the requirements of the FCRA, Plaintiff suffered distinct actual damages, described more fully above, for which Plaintiff seeks actual, punitive and statutory damages, in an amount to be determined by the jury.

**COUNT TWO – VIOLATIONS OF THE FAIR CREDIT REPORTING ACT**
**(Against Trans Union)**

73. Plaintiff adopts and incorporates the above-numbered paragraphs as if fully stated herein.

74. Trans Union negligently failed to comply with the requirements of the FCRA, including Sections 1681b, e(b) and i.

75. Alternatively, Trans Union willfully failed to comply with the requirements of the FCRA, including Sections 1681b, e(b) and i.

76. As a result of Trans Union's failure to comply with the requirements of the FCRA, Plaintiff suffered actual damages, described more fully above, for which Plaintiff seeks actual, punitive and statutory damages, in an amount to be determined by the jury.

**JURY DEMAND**

77. Plaintiff requests a jury trial on all claims.

**PRAYER**

Wherefore, Plaintiff prays for judgment against the defendants as follows:

On the First Claim for Relief:

1. Actual damages to be determined by the jury;
2. Punitive damages to be determined by the jury;
3. Statutory damages to be determined by the jury; and
4. Attorneys' fees and costs.

On the Second Claim for Relief:

1. Actual damages to be determined by the jury;
2. Punitive damages to be determined by the jury;
3. Statutory damages to be determined by the jury; and
4. Attorneys' fees and costs.

Respectfully submitted,

***/s/ Micah S. Adkins***

Micah S. Adkins
(S.D. Ala. Bar No. adkim8639)
**THE ADKINS FIRM, P.C.**
1025 Westhaven Blvd., Suite 220
Franklin, Tennessee 37064
T: (615) 370.9659
F: (205) 208.9632
E: MicahAdkins@ItsYourCreditReport.com
*COUNSEL FOR PLAINTIFF TIARRA STEVENSON*